# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 8, 2013

## STATE OF TENNESSEE v. RENITRA HARLEN

### Appeal from the Circuit Court for Williamson County
### No. I-CR084357-C     Robbie T. Beal, Judge

_____

### No. M2012-01857-CCA-R3-CD - Filed November 26, 2013

_____

A Williamson County jury convicted the Defendant, Renitra Harlen, of two counts of theft of property valued at more than $1,000.00.  The trial court sentenced the Defendant as a Range I, standard offender, to concurrent terms of two years, to be served on probation following the service of fourteen days in confinement.  On appeal, the Defendant contends that: (1) the trial court erred when it allowed the State to introduce a handwritten list of stolen items prepared by store employees immediately after the shoplifting incident occurred; (2) the State failed to disclose a victim questionnaire in violation of the rules of discovery; (3) the trial court erred by failing to merge the two theft convictions; and (4) the evidence is insufficient to support her convictions.  After a thorough review of the record and the applicable law, we remand to the trial court for the entry of modified judgments reflecting the merger of the Defendant's two convictions and affirm the trial court in all other respects.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part and Remanded

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROGER A. PAGE, JJ., joined.

Sandra L. Wells, Nashville, Tennessee, for the appellant, Renitra Harlen.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Senior Counsel; Kim R. Helper, District Attorney General; Mary K. White, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

1

# I. Facts

A Williamson County grand jury indicted the Defendant, Gregory B. Russell, and Jennifer M. Massey[1] for two counts of theft of property valued at more than $1,000.00 from a Kohl's store in Franklin, Tennessee. The cases were severed; Massey pled guilty to her charges, and Russell was tried separately.

At the Defendant's trial, the parties presented the following evidence: Nicole Thompson, a loss prevention supervisor for Kohl's Department Store, testified that her job entailed conducting internal and external investigations of incidents that would cause or result in a loss to the company. Ms. Thompson recalled that, on April 22, 2009, she, along with two other loss prevention employees, apprehended the Defendant and Massey for shoplifting. Russell was apprehended by police.

Ms. Thompson testified that she first observed the Defendant and Massey through closed circuit television while they were in the store's jewelry department. The two women were selecting various pieces of merchandise with no regard to the price of the items. When the women left the jewelry department and walked toward another department, Ms. Thompson left the loss prevention office and went to this area of the store to follow the women. Ms. Thompson, who was behind the Defendant, observed her selecting an item of clothing and then concealing the jewelry in her hand underneath the piece of clothing. Ms. Thompson said that this behavior "is not unlike what shoplifters tend to do." She explained that generally shoppers look at the tag for a price or size when shopping. The Defendant walked toward a rack, grabbed an item without looking at the tag, and threw it over her arm. Ms. Thompson said that this is "not an intentional procedure in shopping" and is behavior that loss prevention supervisors look for when observing shoppers in the store. The Defendant then walked directly to the fitting room area. Massey had already entered one of the fitting room stalls.

Ms. Thompson testified that she entered a fitting room next to Massey. Ms. Thompson recalled what she heard and observed while in the fitting room as follows:

> Massey had carried in a couple of GPS's. And a GPS system, the navigational systems, are enclosed in hard plastic, and you could hear that she was cutting into that hard plastic inside that stall.
>
> A few second later [the Defendant] crossed in front of my fitting

---

[1] Massey was additionally indicted for evading arrest and resisting arrest.

room stall doors and went into the handicapped stall, and then Massey came out of her stall, leaving the hard plastic in that stall, and went in and joined [the Defendant] in the handicapped stall.

Ms. Thompson confirmed that she observed Massey carrying the GPS system into the fitting room. She said that the hard plastic casing for the system makes a "very distinctive sound" when being cut or broken. When Massey exited the fitting room stall and joined the Defendant in the handicap fitting room, Ms. Thompson stepped into the fitting room stall where Massey had been and saw the hard plastic casing from the GPS system left behind.

Ms. Thompson testified that while the two women were in the handicap fitting room stall, she heard "a lot of conversation" and "shuffling around." When the two women exited the fitting room stall, neither woman had any merchandise. Ms. Thompson stepped inside the handicap fitting room stall and found there were no items left behind. Ms. Thompson said that she followed the two women out into the parking lot where the Defendant was standing near the sidewalk and Massey was standing by a vehicle. Ms. Thompson said that she approached the Defendant and introduced herself as a loss prevention supervisor. The Defendant immediately responded "I don't have anything, I don't have any other thing," and cursed, accusing Ms. Thompson of stopping her "for no reason." Ms. Thompson stated that she did not tell the Defendant the reason she approached the Defendant. The Defendant appeared "angry," flailing her arms about and yelled at Ms. Thompson to "search my purse, search my purse."

Ms. Thompson testified that another loss prevention supervisor, Nick Johnson, joined her outside and stayed with the Defendant while Ms. Thompson approached the vehicle where she had seen Massey standing. She found Massey lying down in the back seat of the vehicle. Ms. Thompson knocked on the car window and asked Massey to exit the vehicle. Massey "reluctantly" exited the vehicle. Ms. Thompson said that she asked Massey for the items taken from the store and that Massey removed a GPS system from her "pants area" and gave it to Ms. Thompson.

Ms. Thompson testified that Johnson and the Defendant came over to the vehicle and the Defendant got inside the car and then got back out. Ms. Thompson said that she "assume[d]" this was because the Defendant and Massey did not have the keys to the vehicle. The two women then "aimlessly walked around the parking lot" and refused to re-enter the store with the loss prevention supervisors. Mr. Johnson called the police while Ms. Thompson followed the two women around the parking lot. Ms. Thompson said that both women cursed at her as she followed them.

Ms. Thompson testified that the women finally agreed to go inside the Kohl's store.

Inside the store, the women waited by the cash registers. When a police officer walked in, Massey ran outside while Ms. Thompson remained with the Defendant. Police subdued Massey and placed her in a police car. At this point police brought a third suspect, Russell, inside the store, and the Defendant and Russell were taken to the loss prevention office.

Ms. Thompson testified about the third suspect, Russell, who was apprehended by police. Ms. Thompson explained that originally she had been observing Russell. Due to his behavior, Ms. Thompson went to the loss prevention office to advise a colleague, Nick Johnson, to watch Russell through the surveillance cameras. When she arrived in the office, Johnson was already watching the Defendant and Massey. Ms. Thompson joined Mr. Johnson and watched the two females talking in the jewelry section when Russell joined them and was speaking mostly with the Defendant. Once police had arrived, Massey pointed out Russell to police. Police apprehended Russell outside the store and brought him inside. Ms. Thompson said that she noticed that Russell had changed his shoes and was now wearing a Nike hat. Ms. Thompson said that Russell was not wearing these items when he entered the store or when she first observed him. She said that both the shoes and the Nike hat were Kohl's merchandise.

Ms. Thompson testified that after all three subjects were inside the store, police officers went out to the vehicle and returned with a large bag of Kohl's store merchandise that was found inside the vehicle. Ms. Thompson said that she inventoried the items, identifying the items by UPC numbers as Kohl's merchandise. She said that both the Defendant and Russell confirmed which of the items were taken from the store. Ms. Thompson explained that, in order to cooperate with police as efficiently as possible, loss prevention employees often write down the item, the UPC, and the price of the item in order to give the police a dollar amount for the criminal charge. She said that initially it is handwritten and later entered into the computer system. She confirmed that this was the process used in this case and identified the handwritten document listing the stolen items. The trial court entered the list into evidence with no objection from defense counsel.

Ms. Thompson identified her handwriting on the list, noting that "a few items" were not in her handwriting. Ms. Thompson explained that she wrote out the item, UPC for the item, the value of the item, and the number of each item. She identified one line that showed that nine Vanity Fair women's panties were found among the stolen items. Ms. Thompson asked the Defendant if she took the women's panties, and, after initially claiming Russell took the panties, the Defendant admitted she had taken the panties. Ms. Thompson then went through the list identifying which items were women's items and which were men's items. Ms. Thompson testified regarding the price attributed to each of the items. She explained that every item in Kohl's had "embedded" UPC numbers. If an item did not have a tag, the "embedded" UPC number can be used to find the exact price

4

of the item. Ms. Thompson said that she used either the price on the tag of the item or, if there was not a tag, the "embedded" UPC number from the item when she created the list of stolen items and the value for police. Ms. Thompson testified that the items totaled $1,649.45 and that none of the defendants provided a receipt for the merchandise.

Ms. Thompson identified a photograph she took of the Defendant and a trespass notification that the Defendant refused to sign. Ms. Thompson explained that loss prevention routinely has shoplifters sign a trespass admonition before leaving the store on their own or with a police officer. Ms. Thompson also identified the video recording of the three defendants in the store in April. The State played the video recording for the jury. The video recording depicted the events of this incident consistent with Ms. Thompson's testimony.

On cross-examination, Ms. Thompson testified that Massey took one GPS system into the fitting room stall. Once in the parking lot, Massey handed over one GPS system that she retrieved from her pants. A second GPS system was later found inside the vehicle in the parking lot.

Jennifer Massey, a co-defendant, testified she had been a drug addict since the age of thirteen and "in and out of jail" her whole life. She stated that she had been "clean" since this shoplifting incident at Kohl's store. Massey admitted that her criminal history included convictions for theft of property, possession of stolen property, and forgery. She stated that she pled guilty for her role in these crimes and received a sentence involving split confinement, eight months in jail followed by eight years probation.

Massey testified that she had known the Defendant her "whole life" and that the two had attended school together. She explained the nature of their relationship at the time of these events as follows, "We would go shopping together, I would steal items and she would pay me for them." Massey said that the Defendant and Russell were dating at the time of these events.

Massey testified that she and the Defendant spoke on the telephone the night before and arranged for Massey to steal items the Defendant wanted and then the Defendant would later pay Massey for the items. The following morning, April 22, 2009, the Defendant and Russell drove to Massey's house in the Defendant's car, an Impala. Russell drove the three defendants to the Kohl's store in Franklin, Tennessee. While still in the car, Massey instructed the Defendant to pick out the items she wanted and then meet her in the fitting room area. Massey said that she also told the Defendant "to pick up a navigation system for [her], because [she] had somebody who would buy that."

Massey said that when she entered the store she picked up a navigation system and

took it out to the Defendant's car. When she came back in the store, she found the Defendant in the jewelry section with "some items in her hand." Massey told the Defendant she would meet her in the fitting room area. Massey explained the exchange with a navigation system in the fitting room as follows:

> I cut it out of the box in the dressing room, concealed it. I had got it from [the Defendant] inside the dressing room, went to another dressing room, cut it out of the box, concealed it in my bra, and then went to the dressing room that [the Defendant] was in.

Massey said that she cut the navigation system out of the box with a razor blade. She identified a jewelry crimping tool and a wire cutter she used to remove security tags from clothing in stores. She explained that she had carried these items into the store in her pocket.

Massey testified that upon entering the fitting room stall where the Defendant was, the two women unpackaged some of the items, and Massey concealed those items, perfume and jewelry, in her bra. The two women then left the store. Massey said that, as they exited the store, she was in front of the Defendant and walked directly to the Impala in the parking lot. When she looked back, she saw that a store employee had stopped the Defendant so she got inside the car. She watched a store employee follow the Defendant to the car and slid down in her seat in an attempt to hide. The Defendant proceeded to the car, opened the passenger side door, and sat down inside the car. Massey said that she exited the car and handed the stolen items to the store employee.

Massey testified that she took a necklace, earrings, perfume, black pants, a white top, and nine or ten pairs of underwear for the Defendant. She explained that she concealed the women's underwear in the waist band of her jeans. Massey said that she "assumed" the men's items found in the car were taken by Russell, but that she did not see Russell take the items to the car. Massey stated that the "plan" when the three went to the Kohl's store was "to steal merchandise."

On cross-examination, Massey testified that the Defendant went inside a handicap fitting room stall while the two were in the fitting room area. She said that she left the casing from the GPS system in the fitting room stall. Massey said that when the Defendant met her in the dressing room, she had jewelry and perfume in her hand and clothing folded over her arm.

Kelly Barger testified that at the time of these events she worked as a loss prevention supervisor at a Kohl's store. Ms. Barger recalled that, on April 22, 2009, a police officer brought the Defendant into the loss prevention office and asked Ms. Barger

to "watch her." Later, Russell was also brought into the office. When he entered, Ms. Barger noticed that he was wearing tennis shoes that belonged to the store. She explained that earlier one of the store managers had brought an empty shoe box to the loss prevention office. The empty box matched the pair of tennis shoes that Russell was wearing when apprehended.

Ms. Barger testified that she initially helped compile the handwritten inventory list of stolen items. She explained that the normal procedure was to write down a description of the item, the UPC number, the price of the item, and the quantity of the item. She said that she wrote down two or three items on the inventory list and then Ms. Thompson entered and completed the list. Ms. Barger identified the inventory list of stolen items and two items, "Nike Air Generate" and "Haines t-shirt," that were written in her handwriting. Ms. Barger also identified her handwriting on the trespass admonishment.

Brent Rose, a City of Franklin police officer, testified that he responded to a call from a Kohl's store about a suspect resisting an officer. Upon arrival, he first assisted another officer detain Massey before proceeding inside the store where he learned of a third suspect who was seated in an Impala in the store parking lot. Officer Rose went back out to the parking lot and approached the vehicle where he found Russell. Russell initially denied involvement in the shoplifting until a store employee pointed out that the shoes Russell was wearing were Kohl's property. Officer Rose took Russell inside the store and retrieved the keys to the vehicle from the Defendant. Inside the car, Officer Rose found several box cutters and store merchandise.

Jane Teeples, a City of Franklin police officer, testified that on April 22, 2009, she was dispatched to a Kohl's store. When she arrived, store employees directed her to two women standing near the cash registers. As she approached, Massey ran toward her and out the front door. Officer Teeples pursued Massey and took her into custody. Upon a search of Massey, Officer Teeples found attachments for a GPS unit, earrings, and a necklace. She also found wire cutters in Massey's pocket. Officer Teeples said that shoplifters often use wire cutters to detach security devices in stores. Officer Teeples said that she confirmed that the Defendant was the owner of the Impala where the store merchandise was found.

Based upon this evidence, the jury convicted the Defendant of two counts of theft of property valued at more than $1000.00. The trial court sentenced the Defendant as a Range I, standard offender to concurrent terms of two years on probation following the service of fourteen days in confinement. It is from these judgments that the Defendant now appeals.

## II. Analysis

The Defendant asserts that: (1) the trial court erred when it allowed the State to introduce a handwritten list of stolen items prepared by store employees immediately after the shoplifting incident occurred; (2) the State failed to disclose a victim questionnaire in violation of the rules of discovery; (3) the trial court erred by failing to merge the two theft convictions; and (4) the evidence is insufficient to support her convictions.

## A. Admission of Handwritten List of Stolen Items

The Defendant asserts that the trial court erred when it admitted a list of the stolen items handwritten by Ms. Thompson, a Kohl's store loss prevention supervisor. Specifically, the Defendant contends that the record constituted inadmissible hearsay and that it was improperly introduced as a business record. The State responds that because the record was entered with no objection, the Defendant has waived this issue, and the Defendant has failed to establish plain error.

The Defendant filed a motion in limine asking the trial court to exclude a handwritten list of stolen items prepared by Ms. Thompson on the day of the offense because the store's complete inventory list from April 22, 2009, was not preserved. Without the store's inventory list, the Defendant could not compare the inventory list to the handwritten list of stolen items to ensure the items were actually in the store at the time of the offense. The State responded that, so long as a proper foundation was laid, the handwritten list was admissible at trial, and defense counsel would have the opportunity to cross-examine the witnesses regarding the list. The trial court allowed the State to introduce the handwritten list, reasoning that, if the witness authenticated the list and testified that it was prepared near the time of the alleged incident, the handwritten list was admissible, and any discrepancies would be subject to cross-examination.

During the trial, the State, through Thompson's testimony, introduced the handwritten list. The trial court specifically asked defense counsel if there was an objection, to which defense counsel responded that she had no objection. In the Defendant's motion for new trial, the issue of the handwritten list was once again raised, but this time it was challenged as inadmissible hearsay. The trial court found that the State had properly authenticated the list and introduced it as a business record.

The State correctly notes that appellate relief is generally not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a); *see State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App.1988) (stating that waiver applies when the defendant fails to make a contemporaneous objection); *see also State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11–12, 18 (Tenn. Crim. App. 1987). Tennessee Rule of Evidence 103(a)(1) also provides

8

that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless . . . a timely objection or motion to strike appears of record, stating the specific ground of objection."

This Court may, however, review an issue which would ordinarily be considered waived if the Court finds plain error in the record. *See* Tenn. R. App. P. 36(b). The doctrine of plain error provides that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R.App. P. 36(b). The Defendant, in her brief, asserts that she is entitled to plain error relief in this case because introduction of the handwritten list violated her right to a fair trial under the Due Process Clause.

This Court will grant plain error review only when: "(1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake; that is, the error was so significant that it 'probably changed the outcome of the trial.'" *State v. Hatcher*, 310 S.W.3d 788, 808 (citing *State v. Smith*, 24 S.W.3d 274, 282–83 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994)). "If any of these five criteria are not met, we will not grant relief, and complete consideration of all five factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id*. (citation omitted). We need not consider all five factors when the record clearly establishes that at least one of the factors is not met. *Hatcher*, 310 S.W.3d at 808. It is the defendant's burden to persuade this Court that plain error exists and that the error "was of sufficient magnitude that it probably changed the outcome of the trial." *State v. Hester*, 324 S.W.3d 788, 808 (Tenn. 2010).

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). In general, hearsay statements are inadmissible. Tenn. R. Evid. 802. Some statements, however may be admissible under one of the enumerated exceptions. In this case, the trial court found that the handwritten list of stolen items was admissible as a business record. As relevant to this issue, Tennessee Rule of Evidence 803 provides:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to

9

make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

As this Court has previously stated:

> The term "qualified witness" [in Tenn. R. Evid. 803(6) ] should be given a broad interpretation. To be considered qualified, a witness must be personally familiar with the business's record-keeping systems and must be able to explain the record-keeping procedures. The witness is not required to have personal knowledge of the facts recorded, to have been involved personally in the preparation of the records, or even to know who actually recorded the information.

*Alexander v. Inman*, 903 S.W.2d 686, 700 (Tenn. Ct. App. 1995).

Ms. Thompson testified that, after apprehension of the defendants, the Defendant and Russell were taken to the loss prevention office with the items retrieved from the Defendant's car. Ms. Thompson, as is the practice for Kohl's loss prevention employees, wrote down each item, the UPC number, the price of the item, and the quantity. She explained that Kohl's employed this process because it was the most efficient way to provide police officers at the scene with the necessary information for prosecution. Ms. Barger, also a loss prevention supervisor at the time of these events, confirmed the process of documenting items following a shoplifting incident. She further identified her handwriting on the first two lines of the handwritten list, explaining that she began the list and then Ms. Thompson came into the office and assumed the task of documenting the stolen items.

Based on this evidence, we cannot conclude that the trial court erred by admitting the handwritten list into evidence as a business record. The list of stolen items was compiled at the time of the shoplifting incident and subsequent apprehension of the defendants. The list was begun by Ms. Barger, a Kohl's loss prevention supervisor, and completed by Ms. Thompson, also a Kohl's loss prevention supervisor. As employees and supervisors in the area of loss prevention, both witnesses were personally familiar with the record-keeping system for documenting stolen items and explained the procedure to the jury. As Ms. Barger and Ms. Thompson testified, it was regular practice to create a handwritten list of the stolen items in order to quickly provide police officers with needed information for the prosecution of an offense. Nothing in the testimony, circumstances, or method that indicated a lack of trustworthiness. Thus, the trial court properly admitted the

handwritten list into evidence as a business document.

Accordingly, the Defendant has failed to establish that there was a breach of a clear and unequivocal rule of law. Therefore, plain error relief is not warranted, and we need not proceed with an examination of the remaining *Adkisson* factors. *See Smith*, 24 S.W.3d at 283 ("[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error.") Accordingly, we conclude that Defendant is not entitled to relief on this issue.

### B. Discovery Violation

The Defendant argues that the State failed to disclose a victim questionnaire prior to trial, violating her right to a fair trial. The State responds that the trial court correctly found that the document was not material to the defense. We agree with the State.

At issue are documents containing differing values of the items stolen. At trial, a handwritten list indicating the total value of the stolen items as $1,649.45 was admitted into evidence. This list was compiled on April 22, 2009, the day of the shoplifting incident. Thereafter, Nick Johnson, a Kohl's Store loss prevention supervisor, filled out a victim questionnaire indicating restitution in the amount of $1,053.97. This form was filled out on August 20, 2009, and submitted at the Defendant's sentencing hearing with no objection from defense counsel.

At the motion for new trial hearing, the Defendant argued that the State failed to comply with discovery rules by failing to disclose the victim questionnaire to the Defendant prior to trial. The Defendant had requested discovery and yet had never seen the victim questionnaire. The State responded that it had made the State's file available to the defense and had shown the questionnaire to defense counsel prior to trial. Furthermore, the State pointed out that the same form was in Russell's file, which defense counsel had reviewed.

The trial court made the following findings as to this issue:

> The Court finds that this prejudicial impact is slight. While the Court accepts that there were some discrepancies in the amounts of restitution that was claimed, the Court also acknowledges that [defense counsel] did not spend a lot of time cross-examining the witnesses as to that point. That's not bad lawyering. Quite frankly, [defense counsel] was in a bit of . . . a tough spot. If she cross-examined too . . . aggressively she could well open the door to these other . . . alleged thefts which

the Court had previously excluded. If she didn't cross-examine at all she ran the risk of giving up an issue as to whether this was a class E felony or class D felony and that's a matter of tactics, that's a matter of attorney strategy.

The trial court acknowledged the victim questionnaire's presence in the presentence report demonstrated that this evidence was not "maliciously hidden" from the Defendant and that the

State did not intend to hide the victim questionnaire.

In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). In order to establish a due process violation under *Brady*, four prerequisites must be met:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);
>
> 2. The State must have suppressed the information;
>
> 3. The information must have been favorable to the accused; and
>
> 4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). Favorable evidence has been defined as:

> [E]vidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.

*Johnson v. State*, 38 S.W.3d 52, 56–57 (Tenn. 2001) (quoting *Commonwealth v. Ellison*, 379 N.E.2d 560, 571 (1978)). Evidence is material when "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 58 (citations omitted). The burden of proving a *Brady* violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. *Id.*

Concerning the first *Brady* factor, the Defendant filed a discovery motion requesting the information. As for the second factor, whether or not the State suppressed the information is less clear. Defense counsel claims that the victim questionnaire was not part of the record, and the State claims that it was in the State's file and that the State specifically showed it to defense counsel. The fact that the victim questionnaire is part of the presentence report submitted at the sentencing hearing supports the conclusion that the State did not suppress this information. We also note that the presentence report also shows a restitution amount of $1,053.97. This evidence does not support a finding that the State suppressed the victim questionnaire. We acknowledge defense counsel's argument that the lower value indicated in the victim questionnaire could assist the Defendant in negotiating and/or arguing for an E felony conviction. Further, the discrepancies between the documents could have been used during the cross-examination of the Kohl's employees at trial. However, both amounts are more than $1,000.00, which is consistent with the

Defendant's conviction for theft of property valued at more than $1,000.00. Accordingly, the Defendant has failed to prove by a preponderance of the evidence that a *Brady* violation occurred. The Defendant is not entitled to relief.

## C. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to sustain her convictions for theft of property valued at more than $1,000.00. The State counters that sufficient evidence was presented from which a reasonable juror could conclude that the Defendant committed each of the crimes for which she was convicted.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *See also Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d

13

516, 557-58 (Tenn. 2000).

The jury convicted the Defendant of theft of property valued at more than $1,000.00 pursuant to Tennessee Code Annotated § 39-14-146. The statute defines this crime as:

[A] person commits theft of property if the person, with the intent to deprive a merchant of the stated price of merchandise, knowingly commits any of the following acts:

(1) Conceals the merchandise;

(2) Removes, takes possession of, or causes the removal of merchandise;

(3) Alters, transfers or removes any price marking , or any other marking which aids in determining value affixed to the merchandise;

(4) Transfers the merchandise from one (1) container to another; or

(5) Causes the cash register or other sales recording device to reflect less than the merchant's stated price for the merchandise.

T.C.A. § 39-14-146(a) (2010). The State proceeded to trial under two separate theories: (1) that the Defendant concealed the merchandise; and (2) that the Defendant removed, took possession of, or caused the removal of the merchandise. *Id.*

The evidence, considered in the light most favorable to the State, proves that the Defendant, Massey, and Russell drove, in the Defendant's car, to a Kohl's store in Franklin, Tennessee. The Defendant and Massey had an arrangement where the Defendant would select items she wanted, give them to Massey, and Massey would conceal the items and remove them from the store. The three can be seen on surveillance video talking in the jewelry department of the store where the Defendant selects jewelry and carries it into another section of the store. Ms. Thompson observed, and the surveillance video shows, the Defendant entering the fitting room area with the items hidden under several garments and, later, exiting the fitting room area with nothing in her possession. Massey testified that she and the Defendant arranged for the Defendant to take the items she wanted and meet Massey in the fitting room area where Massey hid the items

14

in her bra and waist band area. The two women had exited the store when they were approached by Ms. Thompson. Massey removed a GPS navigational system from her person and gave it to Ms. Thompson. Later, in the loss prevention office, the Defendant confirmed for Ms. Thompson the items she took from the store.

The Defendant specifically contests the value of the stolen property. She contends that the proof showed that she was responsible for only a necklace, ear rings, perfume, a pair of black pants, a white shirt, and nine pairs of panties, and that the value of these items is less than $1,000.00. The State responds that, under the theory of criminal responsibility, the jury properly found the Defendant guilty of knowingly concealing and removing merchandise valued at more than $1,000.00 from Kohl's.

Under Tennessee law, a person may be charged with an offense if "he or she is criminally responsible for the perpetration of the offense." T.C.A. § 39-11-401, Sentencing Comm'n Cmts. A person is criminally responsible for the conduct of another if, "acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" T.C.A. § 39-11-402(2). Criminal responsibility is not a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). Under a theory of criminal responsibility, an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred. *See State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible. *See id.* To be criminally responsible for the acts of another, the defendant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).

Based on the evidence presented at trial, we conclude that a jury could have found the Defendant criminally responsible for the concealment and removal of merchandise valued over $1,000.00 from Kohl's store. The Defendant associated herself with the venture by contacting Massey and arranging to go to Kohl's the following day for the purpose of stealing items, acted with knowledge that the shoplifting was committed, and shared in the intent with Massey and Russell to steal from a Kohl's store.

Accordingly, we conclude that the evidence is sufficient to support the convictions for

theft of property valued at more than $1,000.00 beyond a reasonable doubt. As such, the Defendant is not entitled to relief on this issue.

## D. Merger

The Defendant contends, and the State concedes, that the Defendant's two convictions should have been merged. The State proceeded to trial on alternate theories of the same offense and the jury convicted the Defendant of both counts. The trial court sentenced the Defendant to concurrent terms of two years on probation for each offense, following the service of fourteen days in confinement.

While the evidence is sufficient to prove both convictions, both convictions may not stand in the face of double jeopardy concerns. *See State v. Beard*, 818 S.W.2d 376, 379 (Tenn. Crim. App. 1991); *State v. Burris*, 40 S.W.3d 520, 524 (Tenn. Crim. App. 2000). It is clear from our review of the record that it was the intent of the parties and the trial court to merge the two convictions because the convictions were based on alternate theories of the same offense. It would appear that the failure to merge the convictions was an oversight. Therefore, we remand to the trial court for the entry of modified judgments reflecting a merger of the two convictions. This will result in a single conviction for the theft of property valued at more than $1000.00. The merger of the convictions will have no effect on the Defendant's effective sentence.

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we remand this case to the trial court for the entry of modified judgments reflecting a merger of the Defendant's two convictions and affirm the judgments of the trial court in all other respects.

_____

ROBERT W. WEDEMEYER, JUDGE

16